UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

PRUCO LIFE INSURANCE COMPANY,

Plaintiff,

v.

GARY A. RICHARDSON; LIFE
BROKERAGE EQUITY GROUP, LLC,
US BANK, AS SECURITIES
INTERMEDIARY; AND JOHN DOES 1-
10,

Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff, Pruco Life Insurance Company ("Pruco")[1], by and through its attorneys,

Drinker Biddle & Reath, LLP hereby files this Complaint for Declaratory Judgment and other

relief, and in support thereof, alleges and states as follows:

## INTRODUCTION

1.     This is an action for fraud, conspiracy, breach of contract, negligent

misrepresentation and declaratory judgment under 28 U.S.C. § 2201 stemming from the

fraudulent procurement of two $5 million insurance policies (the "Guild Policies") on the life of

Florida resident Rosalind Guild ("Ms. Guild").  Pruco is entitled to the relief it seeks because the

Guild Policies were not supported by a valid insurable interest at inception, as demonstrated

---

[1]     Plaintiff Pruco Life Insurance Company is a subsidiary of The Prudential Insurance Company of America.

independently by each of the following facts:  (i) at the time the Guild Policies were issued there was an agreement or understanding that the Guild Policies were to be assigned to one having no insurable interest in the life of Ms. Guild; (ii) the Guild Policies did not and were never intended to protect against an actual risk of loss facing Ms. Guild's family in the event of her death; and (iii) Ms. Guild never paid one cent of premium toward the Guild Policies.

2.     Specifically, documents submitted to Pruco in conjunction with the applications for the Guild Policies contained certain questions intended to discern, among other things, whether the premium for the Guild Policies would be funded by third parties, whether the Guild Policies were intended for resale into the secondary market for life insurance and whether the amount of insurance applied for was justified by Ms. Guild's net worth.  Upon information and belief, the Defendants and others acting on their behalf, however, provided false information in response to these questions.  Had Pruco known:  (i) the true purpose for procuring the Guild Policies; (ii) that the premium for the Guild Policies would be paid by an unrelated third party with no insurable interest in the life of Ms. Guild; (iii) that the Guild Policies were intended for resale into the secondary market; and/or (iv) that the applications and other documents submitted in support of the applications grossly misrepresented Ms. Guild's finances, Pruco would have declined to issue the Guild Policies.

3.     Because the Guild Policies were procured pursuant to a pre-existing agreement or understanding that they would be assigned to one lacking an insurable interest in her life, the Guild Policies were not procured in good faith.  Accordingly, the Guild Policies were not merely the product of fraud, but were also illegal wagering contracts.

4.     Pruco thus seeks equitable relief in the form of a declaration that the Guild Policies are void *ab initio* because the Guild Policies lacked a valid insurable interest at issuance.

Pruco further seeks a declaration that Pruco is entitled to retain some or all of the premium paid to it in connection with the Guild Policies.  To the extent that Pruco is not entitled to retain some or all of the premium paid for the Guild Policies, Pruco alternatively seeks equitable relief in the form of a declaration that Pruco is entitled to offset any return of premium by the costs it incurred in connection with the Guild Policies.  Pruco also seeks a return of commissions paid in connection with Guild Policies, as well as compensatory and punitive damages against the promoters of the illegal life insurance scheme described below.

5.       Pruco will continue to treat the Guild Policies as in-force unless and until it receives the relief it seeks from the Court in this declaratory judgment action (and/or the Guild Policies otherwise lapse).  Pruco's treatment of the Guild Policies as in-force is not a waiver of any of the positions asserted in this action or any other rights under the Guild Policies or at law.

## PARTIES

6.       Plaintiff Pruco Life Insurance Company is an Arizona company with its principal place of business in Newark, New Jersey, and is deemed to be a citizen of New Jersey.

7.       Upon information and belief, Defendant U.S. Bank, as securities intermediary, is a national bank with its principal place of business located at 800 Nicollet Mall, Minneapolis, Minnesota and is deemed to be a citizen of Minnesota.

8.       Upon information and belief, Defendant Gary A. Richardson is a citizen of the State of Florida with an address of 2360 Boy Scout Road, Clearwater, Florida 33763.

9.       Upon information and belief, Defendant Life Brokerage Equity Group, Inc., is a Florida corporation with its principal place of business in Oldsmar, Pinellas County, Florida and is a citizen of the State of Florida.

10.     Pruco joins as defendants Does 1 through 10, who are individuals and/or entities the identity of which are presently unknown.  Pruco is unaware of the true names and capacities of the defendants sued as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names.  Pruco will amend this complaint to allege the true names and capacities of Doe defendants when ascertained.  Pruco believes Does 1 through 10 have participated in the scheme as described more fully herein.  Pruco is entitled to relief as to each of the Doe defendants under the theories described in this complaint.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

12.     This Court has personal jurisdiction over this matter because, among other things, Ms. Guild is a citizen of Florida and she was solicited to participate in a STOLI scheme in Florida by defendant Gary Richardson, a Florida-based life insurance salesman.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events giving rise to each of the claims occurred herein.

## FACTUAL BACKGROUND

### A.     Stranger-Originated Life Insurance

14.     Over the last decade, an insurance market has emerged in which investors have used traditional life insurance as a morbid and speculative investment vehicle, rather than for the income protection and estate planning purposes for which such insurance was created.

15.     In its simplest form, such an investment vehicle is created when a life insurance policy is applied for and issued at the behest of individuals or entities – with no insurable interest in the life of the insured – who procure the policy for the purpose of later transferring it to

investors in the life insurance secondary market.  Such arrangements are commonly referred to as IOLI, which stands for "investor-originated life insurance," or STOLI, which stands for "stranger-originated life insurance."  (These transactions are referred to as "STOLI" herein.)

16.     Though the STOLI market is relatively new, the underlying concept is not; in the late nineteenth and early twentieth centuries, the United States Supreme Court opined against unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies.

17.     State insurable interest laws, which protect the integrity of life insurance by requiring that a policyowner have a cognizable interest in the longevity of the insured at the time the policy is issued, provide a safeguard against STOLI arrangements.  However, STOLI speculators attempt to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible investments.

18.     Logically, STOLI speculators seek out the highest anticipated rates of return when choosing the life insurance policies in which they will invest.  This means the typical life insurance policy such speculators endeavor to fabricate insures the life of an individual aged sixty-five or older.

19.     The perverse result is that the shorter the expected lifetime of the insured, the more valuable the policy becomes to those who would gamble on his or her life; in short, creating a "sinister counter interest" in the death of the insured – precisely the sort of interest condemned by the Supreme Court.  *See Grigsby v. Russell*, 222 U.S. 149, 154 (1911).

20.     Once the speculators locate an individual who meets their investment profile and, more importantly, will agree to collaborate in the STOLI arrangement, an application is made for

one or more insurance policies.  The speculators typically pay most or all of the prospective insured's costs, including premium payments.  Some speculators even agree to pay the prospective insured a fee or other compensation upon the issuance of the policy.

21.     In many instances, STOLI policies are tainted by fraud in the application and/or other supporting documentation presented to, and relied upon by, the insurance carriers in determining whether to issue a policy.  Promoters of STOLI policies look to turn a quick profit, and frequently provide the insurer with false information during the application process in order to obtain a policy with a larger face value than would legitimately be warranted given the insured's financial circumstances.  This, in turn, maximizes the STOLI promoters' profit when the policy is sold to investors.

22.     While there are many variations, all STOLI schemes have one thing in common: their objective is to give investors with no insurable interest in the life of the insured a stake in a life insurance policy on the life of a complete stranger.

**B.      The STOLI Scheme In This Case**

23.     In or around September, 2005, insurance salesman Gary A. Richardson ("Mr. Richardson") and others working in concert with Mr. Richardson including, but not limited to, Defendant Life Brokerage Equity Group ("LBEG"), commenced a STOLI scheme to procure the Guild Policies.

24.     Upon information and belief, Mr. Richardson and LBEG and those working in concert with them encouraged Ms. Guild to participate in a scheme whereby $10 million of life insurance would be applied for – an amount of life insurance that, if issued, would generate substantial commissions for Mr. Richardson and LBEG.

25.     In addition to being illegal wagering contracts, the Guild Policies were also the product of fraud.  The promoters of the Guild Policies, including Defendants Mr. Richardson and

LBEG made numerous fraudulent, material misrepresentations in connection with the applications for the Guild Policies. These misrepresentations concerned, *inter alia*, the purpose for the Guild Policies, the source of premiums for the Guild Policies and the income, assets and net worth of Ms. Guild.

26.     Upon information and belief, the STOLI scheme perpetrated upon Pruco involved procuring the Guild Policies without requiring Ms. Guild, any of Ms. Guild's family members, or anyone with a valid insurable interest in Ms. Guild's life to pay any of the associated costs for the Guild Policies, including the premium; rather, those costs were paid by third parties who were strangers to Ms. Guild.

27.     Upon information and belief, pursuant to the STOLI scheme, Ms. Guild was advised by Mr. Richardson and those working on his behalf that she could obtain free life insurance and/or that she would be compensated for her participation in the transaction with money based upon a percentage of the face amount of the policies issued. Further, upon information and belief, Mr. Richardson and LBEG provided false information on the applications for the Guild Policies and in documents submitted to Pruco in conjunction with the applications for the Guild Policies regarding whether any portion of the premiums for the Guild Policies would be financed and whether the Insureds or policy owners would receive payment in connection with the insurance being sought.

28.     In order to make the procurement of the Guild Policies appear legitimate and to conceal the scheme from Pruco, the scheme also involved the creation of the Rosalind Guild Family Insurance Irrevocable Trust (the "Guild Trust"), which would be the record owner and beneficiary of the Guild Policies. As part of the scheme, the Guild Trust was created bearing Ms. Guild's name in order to make it appear that both the Guild Policies and the Guild Trust

were intended for legitimate purposes, and to make it appear as though the Guild Trust had an insurable interest in the life of Ms. Guild.

29.     Upon information and belief, Ms. Guild effectively lacked involvement in the formation of the Guild Trust.  Indeed, upon information and belief, Ms. Guild did not know that Wells Fargo Bank, N.A. ("Wells Fargo") was installed as the trustee of the Guild Trust at the time the applications for the Guild Policies were submitted.

30.     Upon information and belief, in reality and from the outset, the Guild Policies were sought so that the beneficial interest in the Guild Policies could be sold to investors in the secondary market for life insurance.  Additionally, the issuance of the Guild Policies would generate significant commissions to benefit Mr. Richardson and LBEG.

### C.     Mr. Richardson's Contract With Pruco

31.     Defendant Gary A. Richardson is a life insurance producer.  As such, he is appointed by life insurers to solicit the sale of life insurance policies to individuals, such as Ms. Guild.  Mr. Richardson was formerly appointed with Pruco, although his appointment is in the process of being terminated.

32.     Upon information and belief, Defendant LBEG operated as a broker general agency, or "BGA."  A BGA commonly acts as an intermediary between insurance producers, such as Mr. Richardson, and carriers, such as Pruco.  Mr. Richarson, however, was the principal of LBEG.  Mr. Richardson acted both in his individual capacity, and in his capacity as principal of LBEG, to perpetuate the fraud and STOLI activities set forth in this Complaint.

33.     On or about August 2, 2004, Mr. Richardson was appointed as a non-exclusive broker with Pruco.  A copy of the Broker Agreement signed by Mr. Richardson is attached hereto at **Exhibit A**.  Although the Broker Agreement permitted Mr. Richardson to sell Pruco insurance products, it did not preclude Mr. Richardson from being appointed with other life

insurance companies.  Upon information and belief, Mr. Richardson was appointed with, and permitted to sell, life insurance product for life insurers other than Pruco.

34.     In the Broker Agreement, Mr. Richardson represented to Pruco that he would not "make any misrepresentation…for the purpose of inducing a potential or actual policyowner to purchase…any Policies."  Exh. A, ¶ 3(k)

35.     Mr. Richardson further represented and agreed:

- To comply with all applicable insurance laws and regulations (*id.* at ¶ 4(d));

- To solicit applications for Policies only from applicants for whom the Policies are suitable (*id.* at ¶ 4(f));

- That [Mr. Richardson] and [his] employees or representatives will comply with all applicable insurance laws, regulations and requirements and all other applicable state and federal laws, regulations and requirements in soliciting applications for Policies; that [Mr. Richardson] will be fully responsible for all acts of [his] employees or representatives in soliciting applications for Policies (*id.* at ¶ 4(n)); and

- That no Company Policy shall be sold or used in any manner to or with a viatical company or be part of a viatical settlement (*id.* at ¶ 4(p)).

36.     As set forth in greater detail below, Mr. Richardson breached each of the aforementioned provisions of the Broker Agreement by soliciting and placing two $5 million policies on the life of Ms. Guild with the intention that the Guild Policies would be sold to a STOLI investor on the secondary market and by making various certifications and representations to Pruco concerning, among other things, Ms. Guild's income, assets and net worth which Mr. Richardson knew to be false, and which were intended to fraudulently induce Pruco to issue the Guild Policies.

**D.     Applications For the Guild Policies**

37.     Sometime prior to September 29, 2005, Ms. Guild was approached by Mr. Richardson and/or those acting on his behalf and solicited to participate in a STOLI scheme.

38. The scheme called for the procurement of $10 million in life insurance coverage on Ms. Guild's life with Pruco, and the concealment from Pruco of an understanding or agreement to sell the Guild Policies, and/or an interest in the Guild Polices, to one or more investors in the secondary market. Indeed, at the time the applications for the Guild Policies were submitted, Ms. Guild did not even know the amount of insurance coverage that was being sought.

39. The scheme also called for the creation of the Guild Trust, which would be the owner and beneficiary of the Guild Policies. Neither the Guild Trust nor the Guild Policies, however, were ever intended for legitimate life insurance purposes, such as estate liquidity or financial planning. To the contrary, it was intended and understood from the outset that the Guild Policies, and/or an interest therein, would be transferred to one or more STOLI investors in the secondary market. The Guild Trust was intended to conceal this true purpose and to skirt applicable insurable interest laws.

40. In accordance with this scheme, on or about September 29, 2005, at the direction of Gary Richardson and/or those working on his behalf, Pruco received two applications seeking a combined $10 million in life insurance coverage on Ms. Guild (the "Guild Applications"). The Guild Applications were submitted to Pruco by Gary Richardson and/or those working on his behalf. Copies of the Guild Applications are attached as **Exhibits B and C**. At the time of the Guild Applications, Ms. Guild was eighty years of age.

41. In the Guild Applications, Joan Guild, Ms. Guild's daughter, was listed as the prospective beneficiary of the Guild Policies, ostensibly as the beneficiary of the Guild Trust, which was listed as the prospective owner of the Guild Policies. It was, however, understood and intended by Defendants prior to, and at all times following, the submission of the Guild

Applications, that Joan Guild would not receive the death benefit from the Guild Policies upon Ms. Guild's death, but that any beneficial interest of Joan Guild in the Guild Policies would be eventually sold on the secondary market to an investor with no insurable interest in Ms. Guild's life.

42.     In the "Signatures" portion of both Guild Applications, Ms. Guild, Wells Fargo, as trustee of the Guild Trust, and Mr. Richardson represented to Pruco: "I certify, affirm and understand the following…I believe this policy meets my insurance needs and financial objectives."

43.     Upon information and belief, Ms. Guild never read the Guild Applications before signing them, and had no understanding of the fact that a total face amount of $10 million in insurance coverage was being sought.  In fact, Ms. Guild was not involved in the process of completing the Guild Applications – instead, the Guild Applications were completed by Gary Richardson and/or those acting on his behalf.  Upon information and belief, Ms. Guild was given only the signature pages to sign.

44.     Upon information and belief, $10 million in coverage was an inappropriate amount of coverage for Ms. Guild and, as set forth below, was an amount of coverage that was far greater than Pruco would have considered issuing if it had known the truth about Ms. Guild's income, assets and net worth.  Ms. Guild did not make the decision to apply for $10 million of life insurance coverage and, at the time the Guild Applications were submitted, Ms. Guild was unaware of the amount of life insurance requested by the Guild Applications.

45.     The "Signatures" portion of both Guild Applications also contained notice that "[a]ny person who knowingly and intentionally gives false or deceptive information when

completing an application for insurance or filing a claim, for the purpose of defrauding an insurance company . . . may have committed fraud, or may have violated state law."

46.     Thus, in completing the Guild Applications, the signatories, including Ms. Guild and Mr. Richardson knew that they were required to provide truthful, accurate, and honest responses to the questions presented.  Furthermore, they knew that Pruco would rely upon the statements recorded on the Guild Applications in determining whether to issue the Guild Policies with the face amount requested, or whether to issue the Guild Policies at all.

### E.     Client Information Form Submitted In Support of the Guild Applications

47.     In support of the Guild Applications, Mr. Richardson signed and submitted to Pruco a client information form (the "Client Information Form") dated September 29, 2005 – the same date on which the Guild Applications were signed.  A true and correct copy of the Client Information Form is attached hereto as **Exhibit D.**

48.     In the Client Information Form, Mr. Richardson represented to Pruco that the purpose for the Guild Policies was "financial planning" and the amount of the Guild Policies was determined based upon an "estate analysis."  Upon information and belief, the amount of the Guild Policies was not based upon a legitimate estate analysis, but upon Defendants' desire to procure $10 million in life insurance coverage on Ms. Guild for sale on the secondary market. Further, the Guild Policies were not procured for any legitimate financial planning purpose.  In fact, Defendants Mr. Richardson, LBEG and others working in concert with them knowingly and intentionally created and submitted to Pruco a fraudulent estate analysis which grossly overstated Ms. Guild's income, assets and net worth.

49.     In the Client Information Form, Mr. Richardson represented to Pruco that the purpose for the Guild Policies was "estate conservation."  Upon information and belief, the true

purpose was not estate conservation, but Defendants' desire to procure $10 million in life insurance coverage on Ms. Guild's life for sale on the secondary market.

50.     In the Client Information Form, Mr. Richardson represented to Pruco that he knew Ms. Guild well, and had a business relationship with Ms. Guild that stretched over 3 years. Upon information and belief, at the time the Guild Applications and Client Identification Form were submitted to Pruco, Ms. Guild had never even met Mr. Richardson.

51.     In the Client Information Form, Mr. Richardson represented to Pruco that the source of initial and future premiums for the Guild Policies would be Ms. Guild's "current income or savings account."  Upon information and belief, the initial and future premiums for the Guild Policies were not paid by Ms. Guild.  Further, Defendants understood and intended that none of the premiums for the Guild Policies would ever be paid by Ms. Guild.  In fact, Ms. Guild never paid one cent of premium for the Guild Policies and never could have afforded to pay premium for the Guild Policies.

52.     In the Client Information Form, Mr. Richardson also made the following material representations to Pruco concerning Ms. Guild's income, assets and net worth:

- That Ms. Guild had an unearned annual income of $245,000;

- That Ms. Guild had cash and savings in the amount of $250,000;

- That Ms. Guild had a home valued at $1.75 million;

- That Ms. Guild had existing life insurance cash value of $150,000

- That Ms. Guild had an IRA in a trust worth $2 million;

- That Ms. Guild had personal property valued at $1.2 million; and

- That Ms. Guild had a net worth of more than $9.6 million.

53.     Upon information and belief, each of these representations concerning Ms. Guild's income, assets and net worth was false, was known by Mr. Richardson to be false at the

time it was made, and was made for the purpose of fraudulently inducing Pruco to issue vastly more life insurance coverage than that which Ms. Guild could have qualified for based upon her true income, assets and net worth.  In fact, Ms. Guild's income, assets and net worth all were much less than was represented to Pruco.

54.     Further, Mr. Richardson certified to Pruco in the Client Information Form that "I am not aware of any information, other than that stated in this application that would adversely affect the insurability of [Ms. Guild].  I recommend that the Company accept the proposed insured(s) for coverage."  In fact, Mr. Richardson knew that the representations contained in the Client Information Form were false, and that Ms. Guild was not insurable at $10 million based upon her true income, assets and net worth.

55.     Pruco reasonably relied upon each of the representations in the Client Information Form when determining whether to issue the Guild Policies.  Had Pruco known that any of the representations in the Client Information Form were false, Pruco would have declined to issue the Guild Policies.

56.     Moreover, the misrepresentations in the Client Information Form were part of a larger fraudulent scheme perpetrated by Mr. Richardson, LBEG and others working in concert with them to engage in a STOLI transaction through which the Guild Policies would be sold on the secondary market.

### F.     Confidential Financial Statement Submitted In Support of the Guild Applications

57.     Because the Guild Applications sought $10 million in life insurance coverage, Pruco required third party verification of Ms. Guild's income and net worth.  To satisfy this requirement, Mr. Richardson and those working on his behalf contrived a confidential financial statement (the "Financial Statement") purporting to establish that the Ms. Guild had a net worth

sufficient to justify $10 million in insurance coverage.  Pruco required this third party

verification so that Pruco would have a detailed evaluation from an independent third party of

Ms. Guild's income, assets and net worth and would be able to determine whether Ms. Guild

qualified, financially, for $10 million in life insurance coverage.

58.     On or about October 10, 2005, during the underwriting of the Guild Policies,

Pruco was provided with a Financial Statement in support of the Guild Applications.  A true and

correct copy of the Financial Statement is attached hereto as **Exhibit E**.  The Financial Statement

is on the letterhead of a company called Infinity Financial Group and is purportedly signed by

"Mark Tarshis – Financial Advisor."  Upon information and belief, the information on the

Financial Statement was fraudulent and Mr. Tarshis' signature was forged.

59.     In fact, Mr. Tarshis, to the best of his recollection, has never met anyone by the

name of Rosalind Guild.  Affidavit of Mark A. Tarshis at ¶ 7, attached hereto as **Exhibit F**.

Further, Mr. Tarshis never had knowledge of the personal finances, income, assets, liabilities or

net worth of anyone by the name of Rosalind Guild or Sidney Guild.  *Id.* at ¶ 10.

60.     Mr. Tarshis, in his affidavit, avers that he has never prepared a financial statement

for Rosalind Guild (*id.* at ¶ 11) and prior to reviewing the attached affidavit had never seen the

Financial Statement that purports to bear his signature (*id.* at ¶ 12).

61.     Indeed, Mr. Tarshis did not prepare the Financial Statement which purports to

bear his signature and he did not provide any of the figures included in the Financial Statement.

*Id.* at ¶¶ 13-14.

62.     Mr. Tarshis has no knowledge regarding how the Financial Statement was

generated and did not sign the Financial Statement or authorize anyone to sign the Financial

Statement on his behalf.  *Id.* at ¶¶ 15-16; 18-19.

63.     In the Financial Statement, the following representations were made to Pruco:

- That Ms. Guild had bank accounts and cash valued at $600,000;

- That Ms. Guild had life insurance cash value in the amount of $300,000;

- That Ms. Guild had a primary residence valued at $1.75 million;

- That Ms. Guild had mutual funds and stocks valued at $9.5 million;

- That Ms. Guild had personal property valued at $650,000;

- That Ms. Guild had antiques valued at $2.4 million;

- That Ms. Guild had a spousal IRA in trust worth $4 million;

- That Ms. Guild had total assets, and a total net worth, of $19.2 million; and

- That Ms. Guild had a total annual income of $345,000.

64.     Upon information and belief, each and every one of the representations concerning Ms. Guild's income, assets and net worth set forth in the Financial Statement were false and were known and intended by Mr. Richardson and those working with him to be false. In fact, Ms. Guild's income, assets and net worth all were far less than what was represented in the Financial Statement.

65.     The misrepresentations in the Financial Statement were made with the understanding and intent that they would be relied upon by Pruco, and would mislead Pruco into concluding that Ms. Guild qualified for $10 million of life insurance, which was not, in fact, a suitable amount of insurance for a woman of Ms. Guild's financial means.  Moreover, the misrepresentations in the Financial Statement were part of the larger fraudulent scheme perpetrated by Mr. Richardson, LBEG and others working in concert with them to engage in a STOLI transaction through which the Guild Policies would be sold on the secondary market.

66.     Pruco did, in fact, reasonably rely upon the fraudulent misrepresentations in the Financial Statement when determining that Ms. Guild qualified for $10 million in life insurance

coverage.  Had Pruco known that any of the representations in the Financial Statement were false, Pruco would have declined to issue the Guild Policies.

G.   **Issuance of the Guild Policies and Subsequent Changes of Ownership**

67.   In reliance upon the representations contained in the Guild Applications, Client Information Form, Financial Statement and other documents and information submitted to Pruco by Defendants in conjunction with the Guild Applications, Pruco issued the Guild Policies, each with a face amount of $5 million (policy numbers V1200032 and V1200034).  The Guild Policies were issued on October 21, 2005 and assigned a contract date of June 8, 2005 so that the Guild Policies would be administered as though issued while Ms. Guild was still 79 years of age.[2]  True and correct copies of the Contract Data Pages from the Guild Policies, with redactions of certain personal information, are attached hereto as **Exhibits G and H**.[3]

68.   A delivery receipt for policy number V1200032 was signed on October 20, 2012 by Mr. Richardson and Wells Fargo, as trustee of the Guild Trust.  Mr. Richardson and Wells Fargo signed a delivery receipt for policy number V1200934 on November 2, 2012.  True and correct copies of the Delivery Receipts are attached hereto as **Exhibits I and J**.  An initial premium payment of $374,150.00 was made for policy number V1200032 on or about November 4, 2005, and an initial premium payment of $327,000.00 was made for policy number V1200034 on or about November 8, 2005.  Upon information and belief, these initial premium payments were not drawn upon an account held by Ms. Guild as had been represented to Pruco in the Client Information Form.

---

[2]  This is a common occurrence for flexible premium universal life insurance products.

[3]  The complete copies of the original Guild Policies were delivered to Gary Richardson and Wells Fargo, as owner of the Guild Policies at the time of issuance.  The delivery of the Guild Policies was acknowledged by both via signed delivery receipts, which are attached as Exhibits I and J and discussed in ¶ 68, below.

69.     To date, approximately $1,262,723 in premium has been paid toward policy number V1200032 and approximately $882,329 in premium has been paid toward policy number V1200034.  Therefore, there has been a total of approximately $2,145,052 in total premium paid for the Guild Policies.  Those premium payments have resulted in in commission payments of approximately $268,376.86 to Mr. Richardson and $120,093.37 to LBEG.  Discovery in this matter will reveal that none of that premium was paid by Ms. Guild and that Ms. Guild never could have afforded to pay premium for the Guild Policies based on her legitimate net worth and annual income.

70.     On or about February 13, 2008, Pruco received a request to change the ownership and beneficiary of both of the Guild Policies.  These requests sought to change the owner and beneficiary of the Guild Policies from Wells Fargo, as trustee of the Guild Trust, to Defendant U.S. Bank, N.A., as securities intermediary ("U.S. Bank").  Pruco confirmed the requested owner and beneficiary change on or about February 27, 2008.  As of February 27, 2008, ownership of both Guild Policies was effectively transferred to U.S. Bank.[4]

71.     Upon information and belief, the change of ownership and beneficiary took place in connection with the sale of the beneficial interest in the Guild Policies to an investor with no insurable interest in Ms. Guild's life – exactly what had been understood and agreed upon by the Defendants since before the Guild Policies were issued.

---

[4]  Specimen copies of the Guild Policies, attached hereto as **Exhibits K and L**, contain the same terms and conditions as the original, delivered copies of the Guild Policies, but were generated by Pruco on November 2, 2012 and therefore have been updated to reflect the current status of the Guild Policies.  Therefore, the specimen policies reflect that U.S. Bank, as securities intermediary, is the current owner and beneficiary of the Guild Policies.

72.     Upon information and belief, Mr. Richardson, LBEG and others working in concert with them received remuneration for their participation in the above-described STOLI scheme.

73.     Further, Defendants Mr. Richardson, LBEG and others were at all times acting in concert in order to fraudulently induce Pruco to issue $10 million in insurance coverage on the life of Ms. Guild, and to arrange for the sale of the Guild Policies to investors with no insurable interest in Ms. Guild's life.

<u>**COUNT I**</u>

<u>**DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST**</u>
<u>**(AGAINST U.S. BANK)**</u>

74.     Pruco hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

75.     After a reasonable opportunity for discovery, it will be demonstrated that the Guild Policies were procured in bad faith by certain STOLI promoters, including but not limited to, certain of the Defendants.  The STOLI promoters did not have an insurable interest in the life of Ms. Guild and they always intended for the Guild Policies to be transferred to an investor with no insurable interest in the life of Ms. Guild.

76.     Upon information and belief, the Guild Policies were procured pursuant to an understanding and/or agreement predating the issuance of the Guild Policies, to procure these policies and transfer them to investors with no insurable interest in the life of Ms. Guild.

77.     After a reasonable opportunity for discovery, it will be demonstrated that the Guild Trust was used to conceal the fact that the Guild Policies were procured pursuant to an agreement or understanding aimed at circumventing the applicable laws regarding insurable interest.

78.     After a reasonable opportunity for discovery, it will be demonstrated that the Defendants and those working in concert with them always intended and understood that the Guild Policies would come to be owned by investors lacking an insurable interest in Ms. Guild's life.

79.     It will also be demonstrated that, contrary to the representations that were made to Pruco on the Guild Applications, Client Identification Form, Confidential Financial Statement and other documents submitted to Pruco, the Guild Policies never protected against an actual risk of financial loss in the amount of $10 million.  Further, it will be demonstrated that Ms. Guild never paid any premium toward either of the Guild Policies.  Each of these facts establishes that the Guild Policies were not procured in good faith and therefore lacked an insurable interest at their inception.

80.     As such, Pruco is entitled to a judicial declaration that the Guild Policies are illegal wagering contracts which are void *ab initio*.

81.     Due to the fraudulent nature of this STOLI scheme, Pruco is entitled to a judicial declaration that it is entitled to retain some or all of the premium paid in connection with the Guild Policies.  To the extent that Pruco is determined not to be entitled to retain some or all of the premium paid to it, Pruco alternatively seeks equitable relief in the form of a declaration that Pruco is entitled to offset any amount of premium ordered to be returned by the costs it incurred in connection with the Guild Policies.

## COUNT II

## FRAUD
## (AGAINST RICHARDSON AND LBEG)

82.     Pruco hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

83.     Upon information and belief, the Guild Policies were procured for the purpose of selling them on the secondary market.  In furtherance of this purpose, Mr. Richardson and LBEG made fraudulent misrepresentations regarding, among other things, the true purpose for the Guild Policies, the source of premiums for the Guild Policies and Ms. Guild's income, assets and net worth, with the intention that Pruco would rely on those misrepresentations when issuing the Guild Policies.

84.     Specifically, on the Guild Applications and other documents submitted in conjunction with the Guild Applications, Mr. Richardson and LBEG represented to Pruco that:

- Ms. Guild had a net worth of $19.2 million;

- Ms. Guild had an annual income of $345,000;

- The initial premium would be made by Ms. Guild from her personal income or savings;

- Future premium payments would be made by Ms. Guild from her personal income or savings;

- The purpose for the Guild Policies was "financial planning" and "estate conservation;" and

- The face amount of the Guild Policies was based upon an "estate analysis."

85.     Each of the aforesaid fraudulent misrepresentations was material to Pruco's decision to issue the Guild Policies, and Pruco justifiably relied on these fraudulent misrepresentations when issuing the Guild Policies.  Indeed, Pruco would not have issued the Guild Policies had it known the true facts.

86.     Pruco has incurred substantial damages as a result of the wrongful conduct of Mr. Richardson and LBEG including, among other things, commissions, costs and expenses associated with the issuance of the Guild Policies.

87.    Pruco is also entitled to an award of punitive damages based on the wanton, malicious, deliberate and/or grossly negligent conduct of Mr. Richardson and LBEG as described herein.

## COUNT III

## NEGLIGENT MISREPRESENTATION
## (AGAINST RICHARDSON AND LBEG)

88.    Pruco hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

89.    Upon information and belief, the Guild Policies were procured for the purpose of selling them on the secondary market.  In furtherance of this purpose, Mr. Richardson and LBEG made negligent and/or grossly negligent misrepresentations regarding, among other things, the true purpose for the Guild Policies, the source of premiums for the Guild Policies and Ms. Guild's income, assets and net worth, with the intention that Pruco would rely on those misrepresentations when issuing the Guild Policies.

90.    Specifically, on the Guild Applications and other documents submitted in conjunction with the Guild Applications, Mr. Richardson and LBEG represented to Pruco that:

- Ms. Guild had a net worth of $19.2 million;

- Ms. Guild had an annual income of $345,000;

- The initial premium would be made by Ms. Guild from her personal income or savings;

- Future premium payments would be made by Ms. Guild from her personal income or savings;

- The purpose for the Guild Policies was "financial planning" and "estate conservation;" and

- The face amount of the Guild Policies was based upon an "estate analysis."

91.     Each of the aforesaid negligent and/or grossly negligent misrepresentations was material to Pruco's decision to issue the Guild Policies.  Indeed, Pruco would not have issued the Guild Policies had it known the true facts.

92.     Pruco justifiably relied on these misrepresentations when issuing the Guild Policies.

93.     Pruco has incurred substantial damages as a result of the wrongful conduct of Mr. Richardson and LBEG including, among other things, commissions, costs and expenses associated with the issuance of the Guild Policies.

**COUNT IV**

**CIVIL CONSPIRACY**
**(AGAINST RICHARDSON AND LBEG)**

94.     Pruco hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

95.     Upon information and belief, Mr. Richardson, LBEG and/or others conspired and agreed to commit a fraud to induce Pruco to issue the Guild Policies by, among other things, collaborating to submit fabricated financial documents and information to Pruco in connection with the Guild Applications, and by participating in, facilitating, directing, and/or having knowledge of the: (i) solicitation of Ms. Guild to participate in a STOLI scheme; (ii) submission of the Guild Applications to Pruco, which Mr. Richardson and LBEG knew sought insurance that was not supported by an insurable interest; (iii) use of the Guild Trust to conceal the absence of an insurable interest in connection with the Guild Policies; (iv) transfer of the beneficial interest in violation of applicable insurable interest law; and (v) concealment from Pruco that the Guild Policies lacked an insurable interest at inception.

96.     Upon information and belief, in furtherance of their collaborative and conspiratorial agreement to commit a fraud against Pruco, Mr. Richardson and LBEG knowingly and purposefully concealed the fact that the Guild Policies were at all times intended to benefit investors lacking an insurable interest in Ms. Guild's life.  Mr. Richardson and LBEG knowingly and purposefully made false representations and certifications in the Guild Applications, Client Information Form and Financial Statement in order to induce Pruco to issue the Guild Policies. At all times material hereto, Mr. Richardson and LBEG acted in furtherance of a common scheme intended to benefit themselves and profit at the expense of Pruco.

97.     Upon information and belief, Mr. Richardson and LBEG knew of their own concealment, and that of their co-conspirators, regarding the lack of insurable interest and the fraudulent misrepresentations made in connection with the procurement of the Guild Policies. Further, each knew that Pruco would rely on their representations in determining whether to issue the Guild Policies.  Mr. Richardson and LBEG furthered this conspiracy by, among other things, concealing the lack of any insurable interest in the Guild Policies and by providing false information on the Guild Applications, Client Information Form and Financial Statement and/or failing to correct false information.

98.     Pruco has incurred substantial damages as a result of the wrongful conduct of Mr. Richardson and LBEG including, among other things, the payment of commissions and administration and maintenance costs and fees associated with the Guild Policies.

## COUNT V

## BREACH OF CONTRACT
## (AGAINST RICHARDSON)

99.     Pruco hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

100.    In the Broker Agreement, Mr. Richardson represented to Pruco that he would not "make any misrepresentation…for the purpose of inducing a potential or actual policyowner to purchase…any Policies."

101.    Mr. Richardson further represented and agreed:

- To comply with all applicable insurance laws and regulations;

- To solicit applications for Policies only from applicants for whom the Policies are suitable;

- That [Mr. Richardson] and [his] employees or representatives will comply with all applicable insurance laws, regulations and requirements and all other applicable state and federal laws, regulations and requirements in soliciting applications for Policies' that [Mr. Richardson] will be fully responsible for all acts of [his] employees or representatives in soliciting applications for Policies; and

- That no Company Policy shall be sold or used in any manner to or with a viatical company or be part of a viatical settlement.

102.    Mr. Richardson breached each of the aforementioned provisions of the Broker Agreement by soliciting and placing two $5 million policies on the life of Ms. Guild with the intention that the Guild Policies would be sold to a STOLI investor on the secondary market and by making various certifications and representations to Pruco concerning, among other things:

- Ms. Guild's income, assets and net worth;

- The length of time he had known Ms. Guild;

- The source of the initial and future premium payments for the Guild Policies;

- The purpose for the Guild Policies; and

- How the amount and purpose for the Guild Policies was determined.

103.    Mr. Richardson knew that each of these representations were false, and Mr. Richardson made this misrepresentations with the intent to fraudulently induce Pruco to issue the Guild Policies.

104.    As a direct and proximate result of Mr. Richardson having breached the Broker

Agreement, Pruco has incurred substantial damages as a result of the wrongful conduct of Mr.

Richardson and LBEG including, among other things, the payment of commissions and

administration and maintenance costs and fees associated with the Guild Policies.


**RELIEF REQUESTED**

WHEREFORE, Pruco respectfully requests the entry of an Order by this Court as

follows:

A.    Declaring the Guild Policies void *ab initio* due to a lack of insurable interest at the

inception of the Guild Policies;

B.    Declaring that Pruco is entitled to retain some or all of the premium paid to it in

connection with the Guild Policies;

C.    An award of compensatory damages as warranted under law;

D.    An award of punitive damages as warranted under law;

E.    An award of Pruco's attorneys' fees and costs, as determined by the Court and

associated with seeking this judgment; and

F.    An award of such further relief as this Court deems appropriate.

Dated:  December 17, 2012                PETT FURMAN, PL
                                         Attorneys for Plaintiff
                                         2101 N.W. Corporate Blvd., Suite 316
                                         Boca Raton, FL 33431
                                         (561) 994-4311
                                         (561) 982-8985 (fax)



                                         By:____s/Wendy L. Furman
                                                Wendy L. Furman
                                                Fla. Bar No. 0085146
                                                wfurman@pettfurman.com

*Of Counsel*
Stephen A. Serfass
Nolan R. Tully
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
Stephen.serfass@dbr.com
Nolan.tully@dbr.com

*Attorneys for Plaintiff,*
*Pruco Life Insurance Company*