# EXHIBIT A

 **Prudential Financial**

Richard DeJulio
Director, Compliance

**Prudential Select Brokerage**
213 Washington Street, 18th Floor
Newark, NJ 07102-2992
Tel 800 286 7745  Fax 800 416 5022
www.pruxpress.com

August 2, 2004

Gary Richardson
2963 Gulf to Bay Blvd
Clearwater, FL 33759

Dear Mr. Richardson:

We are pleased to forward a fully executed copy of your Broker Agreement with Prudential. Welcome to Prudential Select Brokerage.

Please contact any member of our brokerage team at 1-800-286-7745 if you have product or licensing questions, require illustrations or are in need of marketing materials or you have any further questions concerning the agreement.

We look forward to doing business with you in the future.

Sincerely,

Richard DeJulio
Director, Compliance

Registered Representative
Pruco Securities Corporation
A Prudential company
751 Broad Street, Newark, NJ 07102-3777

 **Prudential Financial**

Prudential Select Brokerage
a business of
The Prudential Insurance Company of America
**(800) 286-7745**

## BROKER AGREEMENT

### INSTRUCTIONS

- Read the enclosed Broker Agreement.
- Sign Page 11 of two copies of the Agreement.
- Mail both copies of the Agreement to the address below:

Mailing Address

> Prudential Select Brokerage
> 13001 County Road 10
> Plymouth, MN 55442

BA 2003.06



## Broker Agreement

This Broker agreement (hereinafter, the "Agreement") is between The Prudential Insurance Company of America, Pruco Life Insurance Company, and Pruco Life Insurance Company of New Jersey (hereinafter collectively, the "Company") and the individual/ firm whose name appears on page eleven of this Agreement (hereinafter, the "Broker").

1. **Appointment**

    The Company appoints the Broker as a non-exclusive insurance agent to solicit applications for the non-Securities Exchange Commission ("SEC") registered life insurance policies, non-SEC registered annuity contracts and Long Term Care insurance (hereinafter individually, the "Policy" or collectively, the "Policies") of the Company. Such Policies are identified as Eligible Products in a List of Eligible Products (hereinafter, "Exhibit A") attached hereto. From time to time Exhibit A may be updated or amended by the Company. Such updates or amendments will be effective upon written notification to the Broker that a new or amended Exhibit A has been issued.

    The Company will have the sole discretion to appoint any Broker and any employee or representative of the Broker as an insurance agent of the Company.

2. **Authority**

    This Agreement authorizes the Broker to:

    (a) solicit, procure and submit applications for Policies of the Company, provided the Broker is properly state licensed and state appointed to do so, as required by the Company's Licensing, Appointment and Registration Policy and the Company's Long Term Care insurance Licensing, Appointment and Registration Policy (hereinafter jointly referred to as the Company's "Licensing, Appointment and Registration Policy");

    (b) ensure that all Life Insurance policy and Annuity contract placement requirements are satisfied and deliver Policies to policyowners and ensure that the Long Term Care insurance Delivery requirements have been complied with; and

    (c) assist policyowners in obtaining prompt service from the Company with respect to the administration of Policies, and in maintaining their coverage as long as that coverage is in the interest of the policyowner.

3. **Limitations of Broker's Authority**

    The Broker's authority is limited to what is authorized in Section 2. This section is intended to provide examples, not an entire listing, of actions that are outside the authority granted in Section 2. Broker agrees that its authorization is limited to solicitation of applications and marketing of Policies in accordance with this Agreement. Broker represents and agrees on behalf of himself and employees and representatives that none of them will act in a manner not authorized by this Agreement and that any such unauthorized action, including but not limited to the following actions, would be considered a breach of this Agreement.

    (a) bind the Company except as specifically authorized by this Agreement;

    (b) make representations as an agent of the Company in any manner or for any purpose except as specifically authorized by this Agreement;

    (c) make, alter or modify any Policy or receipt;

    (d) waive any provision or condition of any Policy issued by the Company;

**Prudential Financial**

(e) extend the time for payment of any premium on any Policy, bind the Company to the reinstatement of any terminated Policy or accept promissory notes for payment of premiums on any Policy;

(f) adjust or settle any claim or commit the Company with respect to any claim, except as specifically directed in writing by the Company;

(g) provide or offer to provide any inducement not specified in the Policy or any rebate, either directly or indirectly, to any person or entity, as an inducement to purchase any Policy;

(h) accept funds, unless those funds are payable to the Company and only under the following circumstances:

- when the application and the funds are submitted simultaneously and the Company's standards for prepaid applications have been met, or;

- the Company's delivery requirements have been met and the Policy has been delivered;

such funds must be remitted to the Company within one business day of receipt;

(i) incur any expense or liability on account of the Company without specific written authority to do so from the Company;

(j) demand or accept any remuneration other than what is provided by the Company for rendering any service specifically related to the normal maintenance and care of the Company's business. This provision does not prohibit the Broker from accepting fees for any services provided by the Broker other than those authorized by this Agreement;

(k) make any misrepresentation or incomplete comparison for the purpose of inducing a potential or actual policyowner to purchase, convert, lapse, surrender all or any portion of, forfeit, borrow from, or replace any Policies;

(l) induce or attempt to induce any policyowner to relinquish a policy or to withdraw values from a policy when doing so would be in violation of the Company's Replacement Policy;

(m) solicit, procure or submit applications for the SEC registered life insurance policies and annuity contracts of the Company which are controlled by selling agreements between NASD member broker dealers;

(n) deliver, or allow the delivery of, the Policy unless the health of the proposed insured(s) is in accordance with the Company's requirements, if any, and, where required, the first premium is paid in full;

(o) request that a client pre-sign any Policy related form for use at a later date, request a client to sign any Policy related forms unless completed in its entirety or accept any signed Policy related form unless said forms are complete and ready for submission to the Company.

### 4. Broker's Representations

The Broker represents and agrees:

(a) to abide by the Company's policies and procedures related to the solicitation and sale of Policies, which are identified on Exhibit B and made a part hereof;

(b) to abide by any revised or additional policies and procedures that the Company communicates;

(c) to review and become familiar with the Company's Policies prior to soliciting applications for these Policies;

(d) to comply with all applicable insurance laws and regulations;

(e) to use fact finding tools for determining applicant's insurable needs and financial objectives;

(f) to solicit applications for Policies only from applicants for whom the Policies are suitable;

(g) to solicit, procure and submit applications for Policies only if properly state licensed and state appointed to do so as required by the Company's Licensing, Appointment and Registration Policy and to provide the Company copies of all licenses;

(h) that the Broker will not solicit applications for Policies in any state unless the Policy has been approved for sale in that state;

(i) to assist policyowners in obtaining prompt service from the Company with respect to the administration of Policies and in maintaining their coverage as long as that coverage is in the interest of the policyowner;

(j) that all terms and conditions of this Agreement apply to any employee or representative of the Broker who solicits applications for Policies on behalf of the Broker; and the Broker further agrees to ensure that such employees or representatives comply with all terms and conditions of this Agreement;

(k) that except as disclosed to the Company on the Broker's application for appointment:

   i. neither the Broker's insurance license nor the insurance license of any of its employees or representatives has ever been revoked, suspended, or rescinded in any state or jurisdiction;
   ii. neither the Broker nor any of its employees or representatives has ever been fined by any insurance regulator in an amount of $5,000 or more;
   iii. and neither the Broker nor any of its employees or representatives are currently the subject of any disciplinary proceeding or investigation in any state or jurisdiction by any Department of Insurance, Attorney General's office or other governmental authority;

(l) that except as disclosed to the Company on the Broker's application for appointment:

   i. if the Broker or any of its employees or representatives is or has ever been a registered principal or representative of a member of the NASD, the said registration with the NASD is not now and never has been suspended, revoked or canceled;
   ii. neither the Broker nor any of its employees or representatives has ever been fined by the NASD or other self-regulatory organization in an amount of $5,000 or more;
   iii. and neither the Broker nor any of its employees or representatives is currently the subject of any disciplinary proceeding or investigation by the SEC or NASD;

(m) that neither the Broker nor any of its employees or representatives has ever been convicted of any felony or of any offense set forth in United States Code Title 18, Part I, Chapter 47, Section 1033 pertaining to "Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce";

(n) that the Broker and its employees or representatives will comply with all applicable insurance laws, regulations and requirements and all other applicable state and federal laws, regulations and requirements in soliciting applications for Policies; that the Broker will be fully responsible for all acts of its employees or representatives in soliciting applications for Policies;

(o) that the Broker will notify the Company in writing immediately of the termination of the employment or affiliation of an employee or representative who is appointed to represent the Company pursuant to this Agreement.

BA 2003.06

(p) that no Company Policy shall be sold or used in any manner to or with a viatical company or be part of a viatical settlement.

## 5. Independent Contractor

The Broker is an independent contractor and is not an employee of the Company. The Broker is free to exercise independent judgment as to the time, place and means of performing the authority granted, subject to the terms and conditions of this Agreement. The Broker's business and any services provided by the Broker, other than those authorized by this Agreement are not and will not be represented to be the business of the Company.

Service provided by the Broker to any policyowner in connection with any employee benefit program or employee compensation program of any nature is not and will not be represented to be the business of the Company regardless of the use of a Policy or group of Policies issued by the Company in conjunction with the aforesaid program.

## 6. Advertisements and Marketing Materials

The Broker will not publish, issue, circulate or use in any manner whatsoever any advertisements or marketing materials describing or referring to the Company, the Policies or any product of the Company unless such advertisements or marketing materials have been approved in writing in advance by the Company.

The Broker will not misrepresent the Policies or the Company and will make no oral or written representation which is inconsistent with the terms of the Policies or with the information in any illustration or sales literature furnished by the Company.

## 7. Errors and Omissions

The Broker agrees to maintain Errors and Omissions coverage with unimpaired limits of not less than one million dollars and to provide evidence of such coverage satisfactory to the Company upon request by the Company. The Broker will notify the Company in writing immediately if the coverage is terminated or suspended.

## 8. Indemnity

The following indemnification will apply:

(a) the Company will indemnify, defend and hold harmless the Broker, its affiliates, directors, officers and employees or representatives against any losses, claims, damages, judgments, liabilities, penalties or expenses of any nature, including but not limited to reasonable attorneys' fees and court costs which arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in any sales material written and/or approved by the Company;

(b) the Broker will indemnify, defend and hold harmless the Company, its affiliates, directors, officers, and agents against any losses, claims, damages, judgments, liabilities, penalties or expenses of any nature, including but not limited to reasonable attorneys' fees and court costs which arise out of or are based upon any unauthorized use of sales materials or any verbal or written misrepresentations or any unlawful sales practices, or failure of the Broker or its employees or representatives to comply with the provisions of this agreement or the willful misfeasance, bad faith, negligence or misconduct of the Broker or its employees or representatives in the solicitation of applications for, or sale of, Policies.

The indemnification will survive the termination of this Agreement.

## 9. Complaints, Investigations and Proceedings

The Broker will promptly notify the Company of any allegation that the Broker, or any of its employees or representatives, violated any law or regulation which may impact their ability to represent the Company, or any term or condition of this Agreement and will promptly notify the Company of complaints made to the Broker, or any of its employees or representatives, concerning the Company's business. Further, the Broker will provide the Company with full details, including copies of all documents pertaining thereto.

Furthermore, the Broker will cooperate fully with the Company in any regulatory, judicial or Company investigation or proceeding related to the solicitation of applications for or the sale of Policies by the Broker or any of its employees or representatives.

The Broker will keep accurate and complete records of all transactions relating to the solicitation of applications and the sale of Policies for the Company as required by the Company's Document Preservation Policy. These records will be made available to the Company for inspection upon request, including after termination of this Agreement.

10. **Compensation**

In consideration of and as full compensation for the services performed in accordance with this Agreement, the Broker will receive compensation from the Company as set forth in the Company's Commission Schedule provided to Broker at the time of issue for each Life Insurance Policy and Annuity contract and, if applicable, any allowances documented in a separate schedule and the Company's Commission Schedule provided to Broker as part of the delivery package for each Long Term Care insurance Policy ("Compensation"). The Broker will only be entitled to compensation for Policies that have been submitted by the Broker, accepted by the Company, delivered by the Broker and where all the requirements of the Company's Licensing, Appointment and Registration Policy have been satisfied, subject to the following provisions:

(a) Any amount due the Company from the Broker, whether arising from this or any other agreement with the Company, will be repaid by any amount payable under this Agreement, until the amount of such indebtedness is fully paid.

(b) If the Company returns, for any reason, any premiums or purchase payments on any Policy, the Broker will have an immediate obligation to, and will upon demand, repay the Company all the Compensation previously received by the Broker as a result of those premiums or purchase payments.

(c) When two or more Brokers are listed as the writing representative on an application, Compensation for that Policy will be payable in the proportion as directed on the application or in a writing acceptable to the Company.

(d) Compensation due is vested to the writing Broker or the writing Broker's estate, for the period set forth in the Policy Commission Schedule and, if applicable, a separate compensation schedule, provided premiums continue to be paid and such receipt of Compensation is permitted by applicable regulatory agencies.

(e) No Compensation is payable to the Broker after the Policy has lapsed, or after the discontinuance of premium payments, but should the Broker secure the reinstatement of said Policy, while properly licensed to do so, the Company will pay compensation to the Broker on premiums collected, as though the Policy had not lapsed. If the time between the lapse and reinstatement is greater than three months, all compensation (current and future) shall be payable based upon the original issue date of the policy to the Broker who secures the reinstatement and signs the reinstatement form.

(f) Service Commissions, if applicable, as defined in the Company's Commission Schedule, shall be payable for the period and upon the terms set forth in the Commission Schedule.

(g) After the first policy year, no Compensation will be paid on any premium that is waived.

(h) No assignment of Compensation is valid against the Company unless acknowledged in writing by the Company.

(i) If a Policy replaces, in whole or in part, a policy or contract previously issued by this or any other insurance company, the Company has the right to determine what, if any, compensation will be allowed.

(j) If a Policy is changed to a different kind or amount, or if its date is changed, the Company has the right to determine what, if any, compensation will be allowed.

(k) No Compensation will be paid on any Policy issued as the result of the conversion of group life insurance.

(l) The Company will not be obligated to pay any Compensation which would be in violation of applicable laws or regulations of any jurisdiction, anything in this Agreement to the contrary notwithstanding.

(m) Compensation on premiums paid more than three months in advance are payable on the date the premiums are due.

(n) All premiums and Compensation is payable in U.S. currency.

(o) No Compensation is payable on any extra war risk premium which may be charged in connection with any Policy.

(p) The following provisions apply to annuity Policies only:

    (i) For annuities, no Compensation will be paid on proceeds from other Prudential policies or contracts such as cash surrenders, maturities and death claims, including any dividend accumulations and paid up additions which are part of such proceeds.

    (ii) If withdrawals are made from any annuity Policy when surrender charges do not apply, the Company reserves the right to reduce commissions on future purchase payments.

## 11. Privacy

Each party acknowledges that they may be provided with information or access information about customers of Company or Broker ("Customer Information"). Each party agrees to comply with any federal, state, provincial and/or local law or regulation related to privacy. Furthermore, each party represents and warrants that it has implemented and currently maintains an effective information security program to protect the Customer Information, which program includes administrative, technical, and physical safeguards:

(a) to insure the security and confidentiality of Customer Information;

(b) to protect against any anticipated threats or hazards to the security or integrity of such Customer Information; and

(c) to protect against unauthorized access to or use of Customer Information which could result in substantial harm or inconvenience to either party or other affiliates, or to customers of any of them.

## 12. HIPAA

This provision shall be effective with respect to the use of information which is protected health information within the meaning of the Health Insurance Portability and Accountability Act and its implementing regulations at 45 C.F.R. parts

160 and 164 (the "Federal Health Privacy Rules") and shall be applicable notwithstanding the conflicting provisions of this Agreement.

Broker is, or may be deemed to be a "business associate" of Company, as the term "business associate" is defined under the Federal Health Privacy Rules. The capitalized terms used herein shall have the meanings provided for in the Federal Health Privacy Rules where not defined herein. References to the Federal Health Privacy Rules shall mean as enacted and shall include any later amendments, deletions or revisions.

### (a) Broker's HIPAA OBLIGATIONS

(i.) Broker shall only use or disclose the Protected Health Information: (A) as set forth in and in accordance with this Agreement provided that such uses or disclosures are not inconsistent with the Federal Privacy Rules; (B) as required by law; and (C) as expressly provided for in this Sub Section 12(a)(i). The term "required by law" shall have the same meaning as the term "required by law" in 45 CFR Section 164.501. The term "the Protected Health Information" shall have the same meaning as it has in 45 CFR Section 164.501 of the Federal Health Privacy Rules, but only with respect to the information created or received by Broker from or on behalf of Company. Broker hereby represents that any Protected Health Information it shall require from Company shall be the minimum necessary, as defined by the Federal Health Privacy Rules, for the Broker's stated purposes under the Agreement(s) and acknowledges that Company will rely upon such representation with respect to any request for Protected Health Information from the Broker. Broker may use the Protected Health Information:

(A) for the proper management and administration of the Broker;

(B) to carry out the legal responsibilities of the Broker, provided that 1) the disclosure is required [or authorized] by law; or 2) Broker obtains reasonable assurance from a third person to whom the Protection Health Information is disclosed that such Protected Health Information will remain confidential, be used or further disclosed only as required by law or for the reasons it was disclosed to the third person, and the third person notifies the Broker of any instances of which it is aware in which the confidentiality of the Protected Health Information has been breached;

(C) to provide data aggregation services relating to Company's "health care operations," to the extent that such services are provided for in this Agreement.

(D) Broker shall use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided herein and, upon the request of Company, from time to time, provide information to Company about such safeguards.

(E) Broker shall, within fourteen (14) days of becoming aware of any use or disclosure of the Protected Health Information not provided for herein by its Workforce, agents or subcontractors, report such use or disclosure to Company in writing.

(F) Broker shall obtain and maintain an agreement with any agent or subcontractor, to whom it provides any of the Protected Health Information or that will create any Protected Health Information on behalf of the Company or Broker pursuant to which the agent or subcontractor agrees to the same restrictions, terms and conditions that apply to Broker with respect to the Protected Health Information pursuant to this Agreement.

(G) Within ten (10) days of a request by Company, Broker shall, in the manner designated by Company, make available to Company, or as directed by Company, to an Individual, such portions of the Protected Health Information which Company

believes to be within the Designated Record Set so as to permit Company to comply with Section 164.524 of the Federal Health Privacy Rules. In the event any Individual requests access to the Protected Health Information directly from the Broker, the Broker shall, within two (2) days forward such request to the Company. Any denials of access to the Protected Health Information requested shall be the responsibility of the Company.

(H) Within ten (10) days of a request by Company for the amendment of an Individual's Protected Health Information within the Individual's Designated Record Set, Broker shall make available the Protected Health Information for amendment by Company and shall incorporate any amendments to the Protected Health Information in the Individual's Designated Record Set held by the Broker so as to permit Company to comply with Section 164.526 of the Federal Health Privacy Rules. In the event any Individual submits a request for an amendment to his/her Designated Record Set directly to the Broker, Broker shall, within two (2) days forward such request to the Company. Any denials of requests for amendment to the Designated Record Set shall be the responsibility of the Company.

(I) Within ten (10) day of electronic notice by Company to the Broker that Company has received a request for an accounting of disclosures of the Protected Health Information Broker shall notify Company of disclosures (if any) made: for public health purposes, regarding abuse, neglect or domestic violence; to a health oversight agency; in the course of a judicial or administrative proceeding; for law enforcement purposes; to coroners, to medical examiners and funeral directors, to organ procurement organizations; for research; as required by law; to prevent a serious harm to health or safety, to military and veterans officials, or for workers' compensation purposes. In each case Broker shall provide at least the following information with respect to each such disclosure: (A) the date of the disclosure; (B) the name of the entity or person who received the Protected Health Information; (C) a brief description of the Protected Health Information disclosed; and (D) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure. Broker agrees to implement an appropriate record-keeping process to enable it to comply with the requirements of this subsection.

(J) Broker shall notify Company within five (5) business days of the Broker's receipt of any request or subpoena for the Protected Health Information. To the extent that the Company decides to assume responsibility for challenging the validity of such request, Broker agrees to cooperate fully with Company in such a challenge. Broker shall make its internal practices, books, and records relating to the use and disclosure of the Protected Health Information, available to Company, to the Secretary of Health and Human Services ("the Secretary"), in a time and manner designated by Company or the Secretary, for purposes of determining Company's compliance with the Federal Health Privacy Rules.

(K) Broker agrees to mitigate, to the extent practicable, any harmful effect that is known to Broker of a use or disclosure of the Protected Health Information in violation of the requirements of this Agreement.

(L) Broker acknowledges that the disclosure of any portion of the Protected Health Information may cause irreparable injury to Company and damages, which may be difficult to ascertain. Therefore, Company shall, upon a disclosure or threatened disclosure of any of the Protected Health Information, be entitled to injunctive relief to protect and recover the Protected Health Information and Broker shall not object to the entry of an injunction or other equitable relief against Broker on the basis of an

adequate remedy at law, lack of irreparable harm or any other reason. This provision shall not in any way limit such other remedies as may be available to Company at law or in equity.

(M) 11. Broker, at its own expense, shall indemnify and hold harmless Company, its subsidiaries, affiliates and assignees, and their directors, officers, employees and agents, and defend any action brought against same with respect to any claim, demand, cause of action, debt, loss or liability, including attorneys' fees, to the extent based upon a claim that any action or omission by Company breaches any of Company's obligations, representations or warranties under this Amendment. This provision shall not in any way limit any other indemnification that may be provided for in the Agreement(s).

### 13. Termination

(a). This Agreement will be terminated with or without cause by either party immediately upon notice to the other party.

(b). This Agreement may be terminated for violation of provision 12 on five (5) days written notice to the Broker if Company determines that the Broker has violated a material term of provision 12 and such breach is not cured to Company's satisfaction within such five (5) day period; provided that, in the event that in Company's judgment the termination of this Agreement is not feasible, Broker acknowledges that Company shall, in the alternative, have the right to report the breach to the Secretary, and Broker further agrees that such reporting shall not be grounds for termination of this Agreement.

If this Agreement is terminated for a violation of provision 12, Broker shall, at termination,, if feasible, return or destroy all of the Protected Health Information that the Broker still maintains in any form, shall cause the return or destruction of the Protected Health Information held by subcontractors and agents, and shall retain no copies of such Protected Health Information. If such return or destruction is not feasible for certain portions of the Protected Health Information, Broker shall extend the protections of this Agreement and cause the extension of the terms to that Protected Health Information held by subcontractors or agents including, without limitation, the provisions of this Agreement, to the Protected Health Information which it is not feasible to return or destroy and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

Termination will occur automatically at the date and hour of the suspension, revocation, cancellation or rescission of any state insurance license or NASD license or registration of the Broker.

Compensation according to the terms of this Agreement will survive the termination of this Agreement, subject to any conditions imposed by law on payment of compensation.

The Company may at any time, in its sole discretion, withhold or withdraw authority of any employee or representative of the Broker to solicit applications for Policies. Upon the Company giving written notice to the Broker of its withdrawal of authority of an employee or representative to solicit applications, the Broker will immediately ensure that any such employee or representative cease all such solicitations.

### 14. Effective Date

This Agreement is effective once fully executed by both the Company and the Broker. The Effective Date shall be the date the Company executes the Agreement.

15. General Provisions

   (a) <u>Entire Agreement</u> - Except as is provided in general agent and broker dealer agreements, if any, this Agreement and its schedules and attachments thereto, constitutes the entire agreement between the parties and supersedes all other prior Agreements and understandings, oral or written.

   (b) <u>Amendment</u> - Prudential reserves the right to amend this Agreement at any time. Submission of an application for a policy after notice of such amendment will constitute agreement of the Broker to such amendment.

   (c) <u>Non-Waiver</u> - Any right(s) not enforced by the Company under this Agreement will not be construed as a waiver of any of the terms and conditions of this Agreement and the same will remain in full force and effect. A waiver of any provision in this Agreement will not be deemed to be a waiver of any other provision, whether or not similar, nor will any waiver of a provision in this Agreement be deemed to constitute a continuing waiver.

   (d) <u>Severability</u> - Any term or provision of this Agreement which is invalid pursuant to the laws and regulations of that jurisdiction will, as for that jurisdiction, be ineffective. Such term or provision will not render the remaining terms and provisions of this Agreement invalid. In addition, such term or provision will not affect the validity of any of the terms or provisions of this Agreement in any other jurisdiction.

   (e) <u>Captions</u> - The captions or headings of this Agreement are for convenience and ease of reference only. They will have no effect on the meaning or interpretation of any provision of this Agreement.

   (f) <u>Notice</u> - All notices under this Agreement will be in writing and will be deemed given when sent by first-class mail as follows:

Notice to the Company will be mailed to:

Licensing and Administration
Prudential Select Brokerage
13001 County Road 10
Plymouth, MN 55442

Notice to the Broker will be mailed to the Broker's most recent address on file with the Company.

   (g) <u>Governing Law</u> - This Agreement will be governed by the law of the state of New Jersey.

   (h) <u>Survival</u> - Upon termination of this Agreement, all authorizations, rights and obligations shall cease except as those contained in sections 4, 8, 9, 10, 12, 13 and 15.

   (i) <u>HIPAA Interpretation</u> - Any ambiguity in reference to section XII shall be resolved in favor of a meaning that permits Company to comply with the Federal Health Privacy Rules.

BA 2003.06                              10 of 11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date:

| | |
|---|---|
| Name of Broker: | Gary Alan Richardson |
| Signature: | *[signature]* |
| SS#/TIN#: | REDACTED |
| | The Prudential Insurance Company of America |
| Signature: | *[signature]* Vice President, Prudential Select Brokerage |
| Date: | AUG 0 2 2004 |
| | Pruco Life Insurance Company |
| Signature: | *[signature]* Vice President, Prudential Select Brokerage |
| Date: | AUG 0 2 2004 |
| | Pruco Life Insurance Company of New Jersey |
| Signature: | *[signature]* Vice President, Prudential Select Brokerage |
| Date: | AUG 0 2 2004 |

BA 2003.06                              11 of 11

**Prudential Financial**

Exhibit A -- "List of Eligible Products"

Pursuant to Section 1 of the Broker Agreement, the following is a list of Prudential non-variable individual life insurance policies and Long Term Care insurance for which the Broker is appointed to solicit, procure and submit applications, and assist policyowners in obtaining service from the Company.

**Traditional Life Insurance**
PruLife Universal Plus
PruLife Universal Protector
Term Elite
Term Essential
Prudential Guaranteed Life
PruLife® SUL Protector
Prulife® SUL Plus

**Long Term Care Insurance**
Long Term Care$^{SM}$ Insurance

Exhibit B -- List of Policies and Procedures

- Document Preservation Policy - Life Insurance policies and Annuity contracts Only

- Licensing, Appointment and Registration Policy - Life Insurance policies and Annuity contracts Only

- Long Term Care insurance Licensing, Appointment and Registration Policy

- Replacement Policies and Procedures- Life Insurance policies and Annuity contracts Only

- Long Term Care$^{SM}$ Insurance Delivery Requirements